**MOTION PICTURE STUDIO MECHANICS LOCAL 22 INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES, AFL–CIO, Plaintiff,**

v.

**COLUMBIA BROADCASTING SYSTEM et al., Defendants.**

**Civ. A. No. 76–2318.**

United States District Court,
District of Columbia.

July 27, 1977.

Thomas A. Rothwell, Rothwell, Cappello & Berndtson, and John G. Gregg, Washington, D.C., for the plaintiff.

Emanuel Dannett, Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for the defendants.

## MEMORANDUM OF DECISION

SIRICA, District Judge.

In early 1976, each of the three major commercial television networks—the American Broadcasting Company ("ABC"), the Columbia Broadcasting System ("CBS"), and the National Broadcasting Company ("NBC")—decided to discontinue entirely the use of film cameras in its Washington, D.C. news operations and to replace them with newly developed miniature electronic television cameras ("minicams"). Each network also decided that members of local unions other than the Motion Picture Studio Mechanics, Local 22, of the International Alliance of Theatrical Stage Employees ("Local 22"), the plaintiff in this case, would provide the lighting for these new cameras. Members of these other unions—the National Association of Broadcast Employees and Technicians ("NABET") in the case of ABC and NBC, and the International Brotherhood of Electrical Workers ("IBEW") in the case of CBS—had previously provided the lighting for other kinds of electronic cameras. Members of Local 22 had done the lighting for film cameras. Out of the networks' decisions not to assign this lighting work to members of Local 22 has sprung this suit.

Although Local 22 members also have done the camera and sound work for film cameras, the union is considered primarily one for lighting technicians. By successive contracts with each network for many years past, the union has been the "sole and ex-

clusive bargaining representative" for all lighting technicians in the Washington, D.C. area that have been employed by each commercial network "on newsreel and/or documentary work, as previously understood and agreed by the parties . . .." This has meant that each network is under two separate obligations:

(1) to allow only members of Local 22 to provide the lighting for the network's "newsfilm and/or documentary work, as previously understood and agreed by the parties . . .." and

(2) to bargain with union members only through an authorized union representative.

Local 22 claims that the networks have been violating the first of these obligations by assigning lighting work for minicams to members of NABET or IBEW. Although it seeks damages for past violations of this obligation, the union primarily desires an injunction to run the life of the present contracts with the networks to prevent them from assigning the work to members of unions other than Local 22. The plaintiff also claims that NBC violated the second of these obligations in the way that it announced its decision on lighting assignments to some of the union's members. For this violation it also seeks monetary and injunctive relief. Having heard and considered the evidence on both sides, the Court finds that no contract violation occurred.

## I.

### A.

In order to address the first of plaintiff's claims, some background is necessary.

Prior to 1971, the networks used only film cameras to cover routine news events in the Washington, D.C. area. A film crew consisted of three persons, a camera man, a sound man and a lighting man—all members of Local 22. In November of 1971, however, CBS began using a minicam to cover routine stories in this area. That network experimented with the camera for about a year and a half before it and the other two networks began to use minicams

regularly. By 1976, minicam crews had displaced a substantial number of film crews, and in that year, the networks each decided to make a complete change-over.

The primary reason for this is not hard to find. The minicam has been a significant improvement over prior cameras. Previously in covering news events, the networks had to choose between two rather imperfect cameras. One was the standard electronic television camera. It produced a picture which could be shown "live" on the television screen or which could be recorded on video tape for later showing with only a minimum of delay. Unfortunately, this camera weighed over a hundred pounds and had to be mounted on a bulky and even heavier pedestal. It could not be effectively used, then, to cover routine news events outside the studio.

The other choice was the film camera. The kinds used by the networks in their news operations were light and compact enough for nearly all purposes. They had a major drawback, however, in that they used film, which had to be sent to a laboratory for developing before the picture could be shown on the television screen. This meant substantial delays—usually of an hour or more—compared to electronic cameras.

The minicam combined the best features of both of these cameras. Like a television camera, it produced a picture which could be shown live or recorded on video tape. And like the film camera, it could easily be used to cover routine news events virtually anywhere in the metropolitan area. In short, the minicam gave the networks much greater flexibility without any loss in quality.

But using the minicam also gave the networks an additional benefit. Members of IBEW or NABET were assigned to minicam crews and they were willing to work in two-man teams, with one man doing the camera work and another the sound, and both putting up the lights.

Local 22 did not object to the networks' assigning members of unions other than Local 22 to do the camera and sound work

for minicams. But it did object to their doing the lighting work, which had traditionally been the plaintiff's primary expertise. The conflict simmered until 1976, when the networks decided that they were going to convert completely to minicams and give the lighting jurisdiction to NABET or IBEW. Those decisions made the issue one of life or death for Local 22.

## B.

The plaintiff's claim of jurisdiction over minicam lighting, basically, is that at some point it obtained this jurisdiction from each network and that in subsequent contracts the networks and the union have agreed to continue this arrangement. Of crucial importance for injunctive relief, of course, is proof that the parties in the current contracts agreed that Local 22 members should do this work. The Court finds, however, that Local 22 never did obtain jurisdiction over lighting for minicams, and particularly do not have it in the current contracts.

Local 22 has devoted most of its energies to trying to prove that, at some point before the current contracts were negotiated, it obtained jurisdiction over lighting for minicams from all three networks. In support of this contention, it has made four independent arguments.

█ The first is that the change to minicams was, in effect, simply a change to another kind of film camera and that therefore this lighting always had been Local 22's responsibility. This argument would be more persuasive if other unions were not involved. But at the time the minicam was first introduced, NABET and IBEW had jurisdiction over the lighting of standard television cameras for their respective networks, and also had equal expertise for doing the lighting work. These unions could—and did—argue equally strongly, then, that the minicam was simply another kind of electronic camera, and therefore within their jurisdictions. In this circumstance, the Court cannot agree that the minicam, when first introduced, was a "newsfilm" camera under Local 22's contracts with the networks.

█ The plaintiff's second argument is that, by custom and practice over the years, the intended jurisdictional division of lighting work between Local 22 on the one hand and NABET and IBEW on the other has evolved that Local 22 members do the lighting for all work "in the field," and that NABET and IBEW members do the lighting for all the work "in the studio," and also for those major events, such as sports events and tours of the White House, which amount to bringing "the studio" to "the field." Since minicams are used almost exclusively for work "in the field," Local 22 argues it has always had jurisdiction over their lighting. The Court finds, however, that the intended distinction between the two jurisdictions before minicams were introduced was that Local 22 did the lighting for film cameras and NABET and IBEW did the lighting for standard electronic cameras. This has been clear from the words of the jurisdictional grants in the various contracts. *E. g., 1974–1975 Agreement Between Local 22, IATSE, and NBC,* § 1 (1974) (Plaintiff's Exhibit # 1); *NABET–ABC Master Agreement 1973–1976,* art. A–II (1973) (Defendant's Exhibit # 41); *1975 Agreement: IBEW and CBS, Inc.,* sec. 1.03 (1976) (Defendant's Exhibit # 18) [all reflecting similar language in prior agreements]. And, as witnesses for both sides have testified, this distinction has been the one generally recognized by persons in the industry. What the plaintiff has done is simply to state a result which necessarily followed because of the technical limitations of film and standard electronic cameras. There has been no showing whatever that this "field-studio" distinction was ever one agreed to by the parties.

The third argument the plaintiff has made to prove it obtained jurisdiction over minicam lighting is that the networks made a general, though not absolutely consistent, practice of assigning this lighting work to Local 22 members and that this gave the union, either by implicit agreement or by estoppel, jurisdiction over the work. It is clear that on a number of occasions members of Local 22 provided the lighting for

minicams. But the networks have succeeded in negating whatever probative value nearly all of these instances might have had. One kind of situation where members of Local 22 provided the lighting for minicams was where the three networks were going to cover the same news event and agreed beforehand, as they have been permitted to do, to assign just one of the networks' crews to do the lighting. If two film crews and one minicam crew were going to be sent out, then Local 22 members would be assigned to do the lighting. But if two minicam crews were to be sent out, then IBEW or NABET members were assigned to do the lighting. This practice gives no help to the plaintiff.

A second kind of situation arose when minicam crews, manned by NABET or IBEW crews, arrived on the scene and found that a Local 22 member accompanying a film crew had already set up the lighting. Since those lights were adequate for any number of cameras, the minicam crews simply took advantage of those lights. The plaintiff has sought to bolster this kind of instance by claiming that after a period of time even if NABET or IBEW members arrived on the scene first, they would simply wait for a Local 22 film crew to come and do the lighting. But it is clear that, on these occasions, network management had assigned their minicam crews to do lighting. Therefore, whatever these crews in fact did or failed to do cannot fairly be attributed to the networks.

The third kind of situation was lighting done at the White House by Local 22 member Cleve Ryan. Mr. Ryan has done the routine lighting at the White House since approximately 1950 regardless of the kind of camera used. But he is a special case. In fact, he is the only Local 22 member specifically mentioned in the Local 22 agreements with the networks. *E. g., 1974–1975 Agreement Between Local 22, IATSE, and NBC,* § 5(c) (1974) (Plaintiff's Exhibit # 1).

Yet another kind of situation arose in late 1971 and early 1972, when CBS first began experimenting with the minicam in the Washington area. On approximately three occasions during that period, CBS assigned a Local 22 member to provide the lighting for a minicam. But in each instance, an IBEW member of the minicam crew complained to a CBS official that members of Local 22 should not be doing this work. The official agreed and promised to rectify the problem. In addition, on over a hundred other occasions during the period in which CBS was experimenting with the minicam, IBEW members provided the lighting for the camera. Therefore, the three instances cited are of no help to the plaintiff.

The final instance which the networks have completely rebutted was the lighting done for the House Judiciary Committee's hearings on the bill of impeachment of President Nixon. Minicams exclusively were used to record these proceedings, and some of the lights for those cameras were put up by members of Local 22. Other lights in the hearing room, however, were put up by NABET members. Nothing helpful to the plaintiff, then, can be gained from this incident.

When these instances are taken away, Local 22 is left with perhaps a handful of occasions of some probative value. But the networks have established that each has assigned minicam lighting work to members of unions other than Local 22 literally hundreds of times from 1973 to the present. Indeed, this is not surprising, since by using IBEW or NABET members, they were permitted to assign two-man rather than three-man crews. The clear conclusion must be, then, that the general practice of each of the networks has been, from the very beginning, to assign this work not to members of Local 22 but to those of these other unions. Local 22 has completely failed, therefore, to show a general practice from which this Court could infer a positive intent on the part of the networks to give jurisdiction over minicam lighting to Local 22, or from which this Court could find the kind of benefit conferred and harm suffered which are necessary to establish an estoppel.

■ The fourth and final argument made by Local 22 in support of its contention that it at some point obtained jurisdiction over minicam lighting is this: Under the contracts negotiated in 1971–72 and 1973–74, the networks were obligated to bargain in good faith with the union before giving this jurisdiction to other unions; the networks each breached this obligation; therefore, the Court should, as a proper remedy, treat the jurisdiction as having been given to Local 22. But the plaintiff has not been able to point to any provision in these contracts, and the Court has been unable to discover any, which would have put the networks under such an obligation.[1] Therefore, this argument, along with the others, must be rejected.

### C.

The plaintiff has also failed to show the additional element which would be necessary in order to be entitled to injunctive relief—agreement among the parties to the contract now in effect that Local 22 should have jurisdiction over minicam lighting.

The union argues that at the joint negotiations between the IATSE locals, including Local 22, and the networks, the parties agreed to continue the practice as it had existed in the past. Of course, as indicated above, this would simply have meant that the parties agreed that unions other than Local 22 should be assigned to the lighting for minicams. But in reality, this is not at all what the parties agreed to. This suit was filed in the midst of the negotiations. The issue of jurisdiction was an important one for all parties. For their part, the locals submitted a proposed amendment to the jurisdictional statement which had appeared in previous contracts. The amend-

ment was designed to recognize clearly the IATSE locals' jurisdiction over minicam lighting. But, for their part, the networks firmly rejected this proposal on the ground that they had already given this jurisdiction to IBEW or NABET.

The Court finds, therefore, that in the current contract Local 22 does not have jurisdiction over lighting for minicams.[2]

### II.

■ The second claim that the plaintiff has made is that NBC improperly bargained directly with a number of members of Local 22. The facts are these:

In May of 1976, an official of NBC called in several Local 22 members who were employees of the network. He advised them that the company was going to begin using minicams exclusively, and that the lighting work would be assigned to members of NABET. He also stated that NBC would do everything in its power to assure that Local 22 members secured other jobs in the company. Thereafter the official called each member in and asked him if he wished to be assigned to news events on the local side of the network's operations, where film cameras would continue to be used. At least one person agreed to do this.

It is clear that under Local 22's contract with NBC, the network was free to assign Local 22 members to cover local news stories. The Court finds, then, that the network official's conversations with members of Local 22 did not constitute bargaining in any sense of the word. Therefore, the Court finds that NBC did not violate Local 22's rights under the contract to act as the sole bargaining representative of its members.

---

1. Whether the networks' failure to bargain with Local 22 over this jurisdiction was an unfair labor practice this Court cannot say, for its jurisdiction is limited under 29 U.S.C. § 185(a) (1970), to contract claims. But Local 22 did previously file an unfair labor practices charge against the networks with the National Labor Relations Board, which raised claims similar to those raised here. The regional director refused to issue a complaint.

2. The defendants have also argued that under the Norris-LaGuardia Act, 29 U.S.C. §§ 101 et seq., (1970), district courts do not have the power to grant injunctive relief in these kinds of cases. The Court has grave doubts that an employer may use this Act as a shield against injunctive relief sought by a union or an employee. See 29 U.S.C. § 102 (1970). But because the defendants have prevailed on the merits, the Court need not address this question.

## III.

In sum, the Court finds that judgment must be entered for the defendants on both counts.

This opinion shall constitute the Court's findings of fact and conclusions of law.

IT IS SO ORDERED.